# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————

Nº 08-CV-3592 (JFB) (ETB)

———————————

## GRETA KANTROWITZ,

Plaintiff,

VERSUS

## UNIONDALE UNION FREE SCHOOL DISTRICT, ET AL.,

Defendants.

———————————

**MEMORANDUM AND ORDER**
September 30, 2011

———————————

Joseph F. Bianco, District Judge:

Plaintiff Greta Kantrowitz ("plaintiff" or "Kantrowitz") commenced this action against defendants Uniondale Union Free School District ("the District"), the Board of Education of the Uniondale Union Free School District ("the Board"), Terri Mangum ("Dr. Mangum"), and William K. Lloyd ("Dr. Lloyd") (collectively, "defendants"), alleging that defendants discriminated against her in violation of 42 U.S.C. § 1981 and § 1983, Title VII of the Civil Rights Acts of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act ("ADA"), and the New York State Human Rights Law ("NYSHRL") when they abolished her position as Administrative Assistant for Early Childhood and failed to re-hire her to a comparable position in the District. Defendants have moved for summary judgment on the ground that: (1) plaintiff cannot establish that defendants violated her rights under the above-cited statutes and provisions; (2) plaintiff cannot establish a *Monell* claim against the District; and (3) plaintiff cannot establish the requisite level of personal involvement to assert claims against Dr. Mangum and Dr. Lloyd as the individual defendants. For the reasons set forth herein, the Court denies defendants' motion for summary judgment with respect to plaintiff's race and age discrimination claims, but grants defendants' motion with respect to plaintiff's disability discrimination claim. The Court also denies defendants' motion for summary judgment on the *Monell* claim and on the claims against the individual defendants.

## I. Background

### A. Facts

The following facts are taken from the parties' depositions, declarations, exhibits

and respective Local 56.1 statements of facts.[1] Upon consideration of a motion for summary judgment, the Court construes the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005).

Plaintiff is a sixty-three year old Caucasian woman who began her teaching career in 1969, when she was hired as a teacher at a private nursery school after earning her undergraduate degree in early childhood education. (Defs.' 56.1 ¶¶ 10, 18; Pl.'s 56.1 ¶ 4.1.) Several decades later, in 1993, plaintiff was hired as Head Teacher at the Hewlett Jewish Center, where she planned the curriculum for all three and four year olds, and the following year, in 1994, she was hired as a kindergarten teacher in the Lawrence Public School District. (Pl.'s 56.1 ¶ 4.2.) Plaintiff continued to teach kindergarten in the Lawrence Public School District from 1993 to 2000, and also served as the Principal of the summer school in that district in 1999. (Defs.' 56.1 ¶ 20.) Plaintiff holds a Bachelor of Science and a Masters Degree in early childhood education and has received a Certificate in School Administration and Supervision. (Pl.'s 56.1 ¶¶ 4.1, 4.3) Plaintiff is also certified by New York State to teach nursery school through sixth grade. (Defs.' 56.1 ¶ 17.)

In February 2000, plaintiff was appointed to a probationary position of half-time Assistant Principal and half-time Kindergarten Coordinator within the Uniondale Union Free School District. (*Id.* ¶ 21.) In her position as Assistant Principal, plaintiff was responsible only for discipline

at the Grand Avenue Elementary School. (*Id.* ¶ 22.) In her position as Kindergarten Coordinator, plaintiff was responsible for creating and implementing the District's full-day kindergarten program, which involved transitioning nine half-day programs into twenty-four full-day kindergarten classes by September 2000. (*Id.* ¶ 23; Pl.'s 56.1 ¶ 23.) Specifically, as to her responsibilities, plaintiff testified:

> I did the curriculum, I planned the days, I did some ordering of equipment, I sat in on interview committees to hire teachers, I did visits to full day kindergartens with groups of teachers so they could get a model of what we were doing. I did some in-service training with those teachers.

(Kantrowitz Depo. at 25:24-26:5.) Several months later, in June 2000, plaintiff was appointed to a full-time position of Kindergarten Coordinator. (Defs.' 56.1 ¶ 24.) In this full-time position, plaintiff was tasked with "mak[ing] sure that the curriculum was being delivered properly in the 23 kindergartens that were established." (Kantrowitz Depo. at 26:16-19.) In particular, plaintiff testified that she:

> Mostly observed teachers, met with teachers. I ran in-service after school in my offices. I brought in some consultant to work with people that I felt needed some extra service and instruction in some of the things that we wanted to do. That was basically what I did. Planned staff development for that particular staff.

(*Id.* at 26:25-27:7.) This position was probationary, and plaintiff testified that it would take three years for her to receive tenure. (*Id.* at 27:8-16.) One year later, in June 2001, plaintiff was appointed to the

---

[1] Except where otherwise noted, where only one party's 56.1 statement is cited, the cited fact is not contested by the other party or the other party has offered no evidence to controvert that fact.

position of Administrative Assistant for Early Childhood for kindergarten through first grade, with a probationary period to run through February 28, 2003. (Defs.' 56.1 ¶ 25.)[2] In June 2002, plaintiffs' position was expanded to also cover second grade. (*Id.* ¶ 26.)

Plaintiff began having medical difficulties in the fall of 2002. Specifically, in October 2002, plaintiff was diagnosed with lung cancer, and in December 2002, plaintiff suffered a stroke. (*Id.* ¶¶ 27-28.) As to her stroke, plaintiff does not have any symptoms or complications therefrom, and there is nothing she is unable to do or has difficulty doing as a result of the stroke. (*Id.* ¶ 29.) As to her lung cancer, however, plaintiff had to have her lung surgically removed in January 2003, and she took disability leave in connection with this surgery from December 2002 until July 2003. (*Id.* ¶ 31; Pl.'s 56.1 ¶ 33.) Nevertheless, besides running, there is nothing that plaintiff is unable to do as a result of her lung cancer, and she has never requested any accommodations from the District as a result of her lung cancer or her stroke. (Defs.' 56.1 ¶¶ 32-33.) However, plaintiff testified that a Principal from the California Avenue school, Jennifer Bumford, and an Assistant Principal from Northern Parkway, Sheila Jefferson, made comments to plaintiff the effect of "oh, you will have to go to the second floor" or "I am sorry, you are going to have to walk up stairs." (Kantrowitz Depo. at 107:22-108:7.) Plaintiff noted that it "didn't bother [her] to walk up stairs," and she interpreted these comments—which, according to plaintiff,

were made "constantly"—to mean that others perceived her to be disabled. (*Id.*)

In any event, during the time period that she was out on disability leave, plaintiff was granted tenure for her position as Administrative Assistant for Early Childhood. In fact, although the probationary period for plaintiff's position was not set to expire until February 28, 2003, plaintiff was granted tenure early for this position in December 2002. (Defs.' 56.1 ¶ 30; Defs.' Supp. 56.1 ¶ 30.1.) Plaintiff testified that she received notice of her tenure in January 2003, when she was in the hospital for her lung removal surgery. (Kantrowitz Depo. at 29:11-16.) Subsequently, according to the job description that was in effect from June 2004 until plaintiff's position was abolished, plaintiff was responsible for two dozen different tasks, including, *inter alia*: supervising the kindergarten, first grade, and second grade staffs; providing enrichment activities and recommending the supplies for Early Childhood grades; meeting with the five elementary school principals to discuss teacher observations, mid-year and end-of-year evaluations, and curriculum monitoring issues; attending elementary faculty meetings; and visiting the five elementary schools on a regular basis to model strategies of instruction, present new materials, and informally assess the delivery of instruction. (Defs.' 56.1 ¶ 34; Pl.'s 56.1 ¶ 34 (both citing Defs.' Ex. N).) As this description indicates, plaintiff was required to work with the Principals and Assistant Principals of the elementary schools in the District as part of her job responsibilities. (Defs.' 56.1 ¶ 35.) Plaintiff felt that she had good relationships with these Principals, but there is evidence that she sometimes had disagreements with them regarding how to approach the job and supervise teachers. (*Id.* ¶ 36.)

---

[2] Specifically, the Board abolished plaintiff's prior position of "Kindergarten Coordinator," effective June 2001, and created a new position of "Administrative Assistant for Early Childhood," to which plaintiff was appointed. (Pl.'s 56.1 ¶ 25.)

In July 2004, Dr. William Lloyd, an African American man, became Superintendent of the District, after serving as Interim Superintendent from November 2003 until July 2004. (Defs.' 56.1 ¶ 11; Pl.'s 56.1 ¶ 11.) After his appointment as Superintendent, Dr. Lloyd, who was not familiar with plaintiff's position, met with plaintiff and asked her to describe her job to him, which plaintiff did both orally and in writing. (Defs.' 56.1 ¶ 38.) In addition, in or about 2004, Dr. Lloyd met with the principals of the elementary schools in the District, along with Maryann Llewellyn—who at the time was Assistant Superintendent for Curriculum and Instruction[3] and plaintiff's supervisor (Defs.' 56.1 ¶ 40; Kantrowitz Depo. at 35:3-36:10)—to discuss the "overall need" for plaintiff's position. (Lloyd Depo. at 38:17-40:3; 64:8-64:23.) At that time, the principals with whom Dr. Lloyd met informed him that the position was necessary. (*Id.* at 64:22-23; Mangum Depo. at 32:7-9.) There is evidence in the record that some of the principals felt "uncomfortable" discussing plaintiff's position at the meeting, but it is unclear why they felt this way. (*See* Mangum Depo. at 32:3-6 ("There might have been some feeling about the position was one that was not needed anymore and people were reluctant to say that because Greta was present."); Bryant-Bell Aff. ¶ 4 ("During a meeting administrators [sic], Dr. Lloyd inquiring [sic] what Ms. Kantrowitz did in her position, but nobody felt comfortable discussing her position.").)[4] After this

meeting, Dr. Lloyd took no action with respect to plaintiff's position in 2004, 2005, or 2006, and, in fact, he gave plaintiff a positive evaluation (3.8 out of 4.0) in June 2006. (Lloyd Depo. at 40:4-23; Defs.' 56.1 ¶ 43; Defs.' Ex. EE.)

One of the principals with whom plaintiff worked was Dr. Terri Mangum, an African-American woman who served as Principal of the California Avenue Elementary School from 1991 until June 2006. (Defs.' 56.1 ¶ 15.) Plaintiff testified as to her belief that Dr. Mangum did not think plaintiff's position was necessary. (*Id.* ¶ 44.) Specifically, plaintiff testified, "I don't think she thought there was a need for a person in the school rather than the principal to observe and supervise," although plaintiff did not know whether Dr. Mangum's reasoning was based on plaintiff's race or not. (Kantrowitz Depo. at 75:18-76:10.) Indeed, it is undisputed that plaintiff and Dr. Mangum had professional

---

[3] Llewellyn held her position as Assistant Superintendent of Curriculum and Instruction from June 2004 until approximately one year later, when she was appointed to the position of Deputy Superintendent. (Defs.' 56.1 ¶ 40.)

[4] Defendants claim that the Principals were reluctant to speak about plaintiff's position because Llewellyn, with whom defendants claim

plaintiff was friends, was at the meeting. (*See* Defs.' 56.1 ¶ 39; Defs.' Mem. of Law at 4.) However, none of the non-hearsay evidence cited by defendants for this argument actually indicates that Llewellyn's presence was the source of this purported reluctance. For example, Mangum testified that it was "Greta's" presence that made her reluctant to speak about plaintiff's position. (Mangum Depo. at 33:6.) In addition, the affidavits submitted by three of the principals, Juanita Bryant-Bell, Dr. Brenda Williams-Jackson, and Jennifer Bumford, do not provide any reason for their reluctance. (*See* Bryant-Bell Aff. ¶ 4; Williams-Jackson Aff. ¶ 3 ("No one spoke up or had much to say about what Ms. Kantrowitz did during this meeting, other than Linda Friedman, Principal of Walnut Street School."); Bumford Aff. ¶¶ 6-7 ("I felt awkward speaking about another administrator's position during this meeting, so I, and most of the other administrators other than Linda Friedman, did not say much." (Bumford Aff. ¶¶ 6-7).)

and philosophical differences regarding teacher performance issues and educational and supervisory approaches, and that Dr. Mangum was angered on one occasion by some observations performed by plaintiff. (Defs.' 56.1 ¶¶ 45-46.) In addition, Dr. Mangum ignored plaintiff's feedback on one occasion and told plaintiff that she was "picking on" the teacher in question. (*Id.* ¶ 47.) Dr. Mangum retired from her position as Principal in June 2006. (*Id.* ¶ 15.)

In January 2007, plaintiff was in charge of planning an Administrators' Party for current union members. (Defs.' 56.1 ¶ 48; Kantrowitz Depo. at 64:14-65:11.) Although some retired administrators had attended the party in years past, "[i]t had not been the practice" to do so, because current union members' dues pay for the party. (Kantrowitz Depo. at 65:12-66:4.) Accordingly, no one on the committee involved with planning the party had mentioned inviting any retired administrators. (*Id.* at 65:24-66:2.) However, on the day of the event, plaintiff received a phone call that Dr. Mangum, who had retired the previous June, wanted to attend. (*Id.* at 65:22-66:7.) After consultation with Walter Cole, the president of the union, it was determined that Dr. Mangum should not attend the party as a retiree because, according to plaintiff, it would "hurt[] other people who had retired." (*Id.* at 66:13-67:3; Pl.'s 56.1 ¶ 48.1.) Plaintiff then called Dr. Mangum and "apologized and said that we didn't realize that some retired administrators would want to come, but that at this point, number one, the count was in, everything was done, it was late, and that we would try to rectify the situation for June," when another party would be held. (Kantrowitz Depo. at 67:2-3, 67:21-68:8.) According to plaintiff, Dr. Mangum responded that she understood. (*Id.* at 68:18-20.) However, after her telephone call with Dr. Mangum, plaintiff

received another call informing her that several African-American administrators would not be attending the party because Dr. Mangum was not coming. (*Id.* at 68:21-69:7; Pl.'s 56.1 ¶ 48.3 (defendants' admit that plaintiff learned that some African American administrators were planning on boycotting the party because Dr. Mangum was not going to attend).) During this phone call, plaintiff was not told whether the administrators themselves made the decision to boycott the party or whether Dr. Mangum asked them to do so. (Kantrowitz Depo. at 71:12-20.) In addition, Dr. Mangum testified at her deposition that she was not aware of the decision to boycott until after the decision was made, and that she told the administrators that "they were absolutely not to do that" and that "[t]hey were to go to the party." (Mangum Depo. at 29:5-18.) Ultimately, Dr. Mangum was extended an invitation to, and did attend, the party. (Kantrowitz Depo. at 70:9-71:8.)

Later that year, in July 2007, Dr. Mangum became a member of the Board of Education for the District. (Defs.' 56.1 ¶ 14.) That same month, on or about July 14 to 15, 2007, the Board and members of Central Administration, including Dr. Lloyd and Maryann Llewellyn (Lloyd Depo. at 22:25-23:8), participated in a retreat. (*Id.* ¶ 52.) According to Dr. Lloyd, the purpose of the retreat was "[t]o set goals for the upcoming school year and to discuss what went well and what we could do to improve the incoming school year." (Lloyd Depo. at 22:21-24.) According to Dr. Lloyd, no one informed him at the retreat to "look into the validity" of plaintiff's position. (*Id.* at 70:24-71:4.) Instead, at some point in the two weeks following the retreat, a Board Member approached Dr. Lloyd at an Executive Session of the Board and asked him to examine the validity of the program, and Dr. Lloyd accordingly recommended that they conduct an evaluation. (*Id.* at 68:2-

71:6.)  Dr. Lloyd testified that he believed the Board Member who made this request was "Mrs. Mabry," and he denied that the request came from Dr. Mangum.  (*Id.* 41:6-21.)

After Dr. Lloyd received this request, he proceeded to conduct an evaluation by speaking with four of the five current elementary school principals in the District.  (*Id.* at 26:24-27:2.)  Of the four principals with whom Dr. Lloyd spoke, three were minorities and one was a Caucasian.  (Defs. 56.1 ¶ 57.)  The principal Dr. Lloyd chose not to speak with was Linda Friedman, Principal of the Walnut Street Elementary School, because, in Dr. Lloyd's words, Ms. Friedman "would always brag about how positive and how good [plaintiff] was in her school."  (Lloyd Depo. at 27:10-19.)  Because Ms. Friedman had "told [Dr. Lloyd] this before," he felt it was not "necessary" to speak with her again.  (*Id.* at 27:20-23.)  Dr. Lloyd noted that Ms. Friedman is Caucasian.  (*Id.* at 27:24-28:2.)  Dr. Lloyd also chose not to speak with Ms. Llewellyn, despite her job in Central Administration, because, according to Dr. Lloyd, "[i]t came to my attention that current Deputy Superintendent Mrs. Llewellyn was very close personal relationship [sic] with Mrs. Kantrowitz and I didn't feel like I could get an objective answer."  (*Id.* at 46:8-21.)  Dr. Lloyd could not recall who informed him about Ms. Llewellyn and Ms. Kantrowitz's friendship.  (*Id.* at 46:24-47:6.)[5]  However, Dr. Lloyd

Specifically, the relevant excerpt from plaintiff's testimony reads as follows:

Q:  What about Barbara Kosinski, can you describe for me your relationship with her?

A:  As I said she was as [sic] colleague.  We were close.  She was at my home.

Q:  Were you friends with her?

A:  I was fairly friendly with her, yes.

Q:  Did you ever feel that she harbored any animus toward you?

A:  No.

Q:  What about Maryann Llewellyn?

A:  She was my  as well.

Q:  What about your work relationship?

A:  I had a very good work relationship.

Q:  Are you still friends with Miss Llewellyn?

A:  No, I am not.

Q:  Did something happen to change your relationship?

A:  Yes.

Q:  What was that?

A:  I lost my job in Uniondale.

(*Id.* at 38:7-39:3.)  However, plaintiff stressed in a written declaration submitted after her deposition that she was not "close personal" friends with Ms. Llewellyn, that Ms. Llewellyn remained plaintiff's "boss in all sense [sic] of the word," and that "[w]hatever relationship that existed between Ms. Llewellyn and I grew from our positions within the District, but our relationship never had anything to do with Ms. Llewellyn's supervision of my position."  (Kantrowitz Decl. ¶ 2.)  As to Ms. Llewellyn's deposition, she testified that she was "friendly" with plaintiff during plaintiff's employment with the District and that the two socialized "[m]aybe three" times.  (Llewellyn Depo. at 12:22-14:2.)

---

[5]  The Court notes that the extent of plaintiff's friendship with Ms. Llewellyn is unclear from the record.  Specifically, although plaintiff appears to have acknowledged in her deposition that she had been friends with Ms. Llewellyn, the transcript is actually missing the word "friends" and instead reads that Ms. Llewellyn "was my as well."  (Kantrowitz Depo. 38:17.)  Nevertheless, given the context in which this statement was made, it is appears that the transcript should read "was my *friend* as well."

did speak with a former elementary school principal, Marilyn Hangen, who is Caucasian. (Defs.' 56.1 ¶ 58.)

As to how Dr. Lloyd conducted his evaluation, he spoke to the four current principals and the one retired principal once each by phone and did not take any notes or keep any written documentation of his conversations. (Pl.'s 56.1 ¶¶ 56.2-56.4.) Dr. Lloyd testified that the four principals told him that plaintiff "was rarely in the building and that she was in one particular school almost always." (Lloyd Depo. at 30:5-8.) He also noted that the principals reported that "the position could be completed and run by the current administration in the school and it was not necessary." (*Id.* at 65:10-15.)

During this same time period, on or about July 14, 2007, plaintiff and Ms. Friedman traveled to Oxford, England to present a paper to the Oxford Roundtable, which was described by plaintiff as "a gathering of scholars who share new and innovative programs they have been able to do in school districts." (Defs.' 56.1 ¶ 50; Kantrowitz Depo. at 80:16-19.) Dr. Lloyd had recommended that plaintiff attend the roundtable, and the Board of Education approved plaintiff's request to attend. (Defs.' 56.1 ¶ 51.) Notably, in May 2007, the Board also had approved plaintiff's position in the budget. (Kantrowitz Depo. at 57:4-5.) Approximately two weeks after plaintiff's return from the roundtable, however, on or about July 30, 2007, plaintiff and her union representative attended a meeting with Dr. Lloyd wherein he informed plaintiff that on August 21, 2007, the Board was going to vote on his recommendation to abolish plaintiff's position. (Defs.' 56.1 ¶ 63.) Plaintiff recalls that Dr. Lloyd said that the recommendation to eliminate plaintiff's position had been made at the Board retreat (Kantrowitz Depo.

at 87:5-8), but, as noted *supra*, Dr. Lloyd testified that no one informed him at the retreat to "look into the validity" of plaintiff's position. (Lloyd Depo. at 70:24-71:4.) At the August 21 Board meeting, the Board voted to abolish plaintiff's position effective September 4, 2007. (Defs.' 56.1 ¶ 68.)[6]

After plaintiff was terminated, defendants claim that she was placed on a "preferred eligibility list" for future openings. (Defs.' Ex. X.) Dr. Lloyd and Dr. Mangum also recalled that Dr. Mangum was concerned about finding plaintiff another position in the District. (Lloyd Depo. at 42:6-10; Mangum Depo. at 46:25-47:3.) Plaintiff, however, disputes this contention, arguing, *inter alia*, that she was never offered a position comparable to her abolished position. (Pl.'s 56.1 ¶ 70.) In any event, it is undisputed that plaintiff was offered a sixth grade teaching position, but that she declined this position because it was a "leave replacement" position[7] and because, as an early childhood educator, she did not feel qualified to teach sixth grade. (Defs.' 56.1 ¶¶ 75-76.) Specifically, plaintiff testified that she was "offered . . . a sixth grade position which, it was a leave replacement, not a permanent position. I never taught sixth grade and my expertise is in early childhood. It was not a position I

_____

[6]  The Court notes that defendants' 56.1 statement reads that this vote occurred on August 21, 2010, instead of August 21, 2007, but this appears to be a typographical error.

[7]  Plaintiff argues that leave replacement positions are temporary, while defendants argue that such positions can be turned into permanent positions. (*Compare* Pl.'s 56.1 ¶ 75 *with* Defs.' Supp. 56.1 ¶ 75.) In any event, it appears uncontroverted that, although the position *could* be turned into a permanent position, it was not permanent at the time that it was offered to plaintiff.

would take." (Kantrowitz Depo. at 99:13-17.) Similarly, plaintiff was offered and rejected an early childhood position because it also was a leave replacement position. (Defs.' 56.1 ¶¶ 77-78.) Ms. Llewellyn and Ms. Friedman sought to create a permanent substitute kindergarten teaching position for plaintiff at Ms. Friedman's school, but Dr. Lloyd rejected this plan. (*Id.* ¶ 79.)

In addition, plaintiff was invited to interview for an assistant principal position that was to be split between the California Avenue School and the Northern Parkway School. (*Id.* ¶ 80.) Plaintiff testified that she felt this invitation to interview was mere "lip service" because one of the interview committee members was a teacher whose tenure plaintiff previously had opposed. (Kantrowitz Depo. at 137:21-138:4.) In fact, this teacher, Claire Meng, gave plaintiff a score of twenty out of fifty, which was the lowest score received out of all the interview candidates. (Pl.'s 56.1 ¶ 82.1) One of the other members of the interview committee, however, submitted a declaration stating that plaintiff "did not continue further in the interview process for this position because the interview committee felt her experience was limited to early childhood and they wanted more well-rounded candidates, especially because of our concerns about testing that occurs in the third, fourth, and fifth grades." (Bumford Decl. ¶ 22.)[8]

Ultimately, Amy Dirolf,[9] a thirty-one year old Caucasian woman, was hired for the position. (Defs.' 56.1 ¶ 85.) The District, however, decided not to split the position between two schools as originally planned and, instead, assigned Ms. Dirolf to the California Avenue School. (*Id.* ¶ 86.) Accordingly, a position opened for an assistant principal position at Northern Parkway, and plaintiff submitted an application. (*Id.* ¶ 87.) According to defendants, plaintiff was not invited to interview for this position after submitting her application because "the members of the interview committee has recently interviewed the plaintiff for an assistant principal position and did not consider her a viable candidate for the position." (Defs.' Ex. Z (Defs.' Resp. to Pl.'s Interrogatories, Resp. No. 11).) Plaintiff, however, contends that there were ten members of the new interview committee that were not on the original committee, and there were only four members who overlapped between the two. (*Compare* Defs.' Ex. BB *with* Defs.' Ex. Y.)

Plaintiff points to several other individuals who were younger than plaintiff or who were minorities, or both, and who allegedly were treated more favorably than plaintiff. (Pl.'s Opp. at 4-5, 12.) For example, Paul Brown ("Brown"), a fifty-seven year old African American man, was appointed to the position of Director of Physical Education, Athletics, and Health in May 2003, and was given a probationary term of July 1, 2003 to June 30, 2006. (Defs.' 56.1 ¶ 109.) After being advised that he would not receive tenure at the end of this probationary term, Brown requested that

---

[8] Plaintiff testified that she heard that a member of the interview committee, Dr. Brenda Williams-Jackson, was caught changing applicants' score sheets to ensure that African American candidates were given consideration. (Kantrowitz Depo. at 125:19-126:3.) However, plaintiff's only support for this assertion is a double hearsay statement. Accordingly, the Court has not considered plaintiff's testimony regarding Dr. Williams-Jackson's alleged actions.

[9] Amy Dirolf's last name is alternatively spelled in the parties' submissions as "Dirolf" and "Diroff." Based upon a review of the record, it appears that the proper spelling of her last name is "Dirolf," and the Court accordingly has used this spelling in its opinion. (*See* Defs.' Ex. AA.)

his probationary term be extended, and this request was granted. (*Id.* ¶ 110.) Brown subsequently was granted tenure in this position effective June 30, 2007. (*Id.* ¶ 111.) As another example, Justin Williams ("Williams"), a thirty-four year old African American man, was appointed to the position of high school teacher in August 2004, with his probationary period to run from September 1, 2004 to August 31, 2007. (*Id.* ¶ 113.) As with Brown, when it appeared that Williams would not be granted tenure at the end of his probationary term, he requested and was granted an additional probationary year, after which he was granted tenure. (*Id.* ¶ 114.) In addition, Wendy Baldwin ("Baldwin"), a fifty-two year old African American woman, was appointed to a position as assistant principal of a District high school in 2004, after serving in various other positions in the District. (*Id.* ¶¶ 115-17.) When she was notified that she would not be recommended for tenure, Baldwin resigned from her position and returned to a position she had previously held as a special education teacher in a middle school. (*Id.* ¶ 117.)

## B. Procedural History

Defendants filed their motion on October 15, 2010. Plaintiff filed her opposition on December 20, 2010. Defendants filed their reply on January 19, 2011. The Court held oral argument on defendants' motion on March 4, 2011. This matter is fully submitted, and the Court has considered all of the parties' arguments and submissions.

## II. Standard of Review

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may only grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (internal quotation marks omitted); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts. . . . The nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence

is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone "will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars' showing that a trial is needed." *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

## III. Discussion

### A. Employment Discrimination

#### 1. Legal Standard

Claims for employment discrimination based on race, age, and disability brought pursuant to § 1983 or pursuant to Title VII, the ADA,[10] or the ADEA are analyzed under the three-step, burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). *See McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009) (applying *McDonnell Douglas* to claim brought under the ADA); *Kearney v. Cnty. of Rockland ex rel. Vanderhoef*, 185 F. App'x 68, 70 (2d Cir. 2006) (holding that plaintiff's "equal protection claim pursuant to 42 U.S.C. § 1983 for age-based employment discrimination fails for the same reasons that her ADEA and NYSHRL claims fail" under

---

[10] Congress recently enacted the ADA Amendments Act of 2008 ("ADAAA"), effective January 1, 2009, which expanded the class of individuals entitled to protection under the ADA. However, this Court and other courts—including the Second Circuit in at least three summary orders—have indicated that the ADAAA does not apply to conduct that occurred prior to the effective date of the statute. *See, e.g., Ragusa v. Malverne Union Free Sch. Dist.*, 381 F. App'x 85, 87 n.2 (2d Cir. 2010) ("[W]e here apply the version of the [ADA] in effect during the time period at issue, which ended with [plaintiff's] termination on June 30, 2005."); *Rogers v. City of New York*, 359 F. App'x 201, 203 n.1 (2d Cir. 2009); *Cody v. Cnty. of Nassau*, 345 F. App'x 717, 720 (2d Cir. 2009) ("[I]t is unlikely that the ADA Amendments Act of 2008 . . . applies to conduct that occurred before the Act's effective date of January 1, 2009. We need not decide the retroactivity issue. . . ."); *Schroeder v. Suffolk Cnty. Cmty. Coll.*, No. 07-CV-2060 (JFB)(WDW), 2009 WL 1748869, at *6 (E.D.N.Y. June 22, 2009) (collecting cases); *see also White v. Sears, Roebuck & Co.*, No. 07 Civ. 4286(NGG)(MDG), 2009 WL 1140434, at *5 (E.D.N.Y. Apr. 27, 2009) ("The court therefore . . . concludes that the [ADAAA] should not apply to this case. This is consistent with the conclusions of other courts in this circuit that the 2008 Amendments do not apply to conduct prior to the effective date of the amended statute." (collecting cases)); *Moran v. Premier Educ. Group, LP*, 599 F. Supp. 2d 263, 271-72 (D. Conn. 2009) ("[I]t appears that every court that has addressed this issue, which includes a number of federal district courts and at least one federal appeals court, has concluded that the 2008 Amendments cannot be applied retroactively to conduct that preceded its effective date." (collecting cases)). Thus, the Court will evaluate plaintiff's evidence within the legal framework in place at the time of plaintiff's termination in 2007 and not under the ADAAA.

*McDonnell Douglas* analysis); *D'Cunha v. Genovese/Eckerd Corp.,* 479 F.3d 193, 194-95 (2d Cir. 2007) (ADEA claim); *Mathirampuzha v. Potter,* 548 F.3d 70, 78 (2d Cir. 2008) (Title VII racial discrimination claim); *Sorlucco v. N.Y.C. Police Dep't,* 888 F.2d 4, 6-7 (2d Cir. 1989) (holding that three-step analysis outlined in McDonnell Douglas applies to claims brought under § 1983).

Under this analysis, "a plaintiff . . . has the initial burden of establishing a prima facie case of discrimination." *Sorlucco,* 888 F.2d at 7. To establish a *prima facie* case for race or age discrimination, a plaintiff must show: (1) membership in the protected class; (2) qualification for the position; (3) an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *See Mathirampuzha,* 548 F.3d at 78 (citation omitted); *accord Roge v. NYP Holdings, Inc.,* 257 F.3d 164, 168 (2d Cir. 2001) (to establish a prima facie case of age discrimination, a plaintiff must demonstrate that: "(i) at the relevant time the plaintiff was a member of the protected class; (ii) the plaintiff was qualified for the job; (iii) the plaintiff suffered an adverse employment action; and (iv) the adverse employment action occurred under circumstances giving rise to an inference of discrimination, such as the fact that the plaintiff was replaced by someone 'substantially younger'" (quoting *O'Connor v. Consol. Coin Caterers Corp.,* 517 U.S. 308, 313 (1996) (additional citations omitted)). Similarly, to succeed on an ADA claim, a plaintiff must prove that "'(1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning of the ADA; (3) plaintiff was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of his disability or perceived disability.'" *Kinneary v. City of New York,* 601 F.3d 151, 155-56 (2d Cir. 2010) (quoting *Capobianco v. City of New York,* 422 F.3d 47, 56 (2d Cir. 2005)). The Second Circuit has characterized the evidence necessary for the plaintiff to satisfy this initial burden as "minimal" and "*de minimis.*" *See Zimmermann v. Assocs. First Capital Corp.,* 251 F.3d 376, 381 (2d Cir. 2001).

Once a plaintiff establishes a *prima facie* case of discrimination, "the burden of production [shifts] to the defendant, who must proffer a 'legitimate, non-discriminatory reason' for the challenged employment action." *Woodman v. WWOR–TV, Inc.,* 411 F.3d 69, 76 (2d Cir. 2005) (quoting *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 91 (2d Cir. 2001)). If the defendant articulates a legitimate, nondiscriminatory reason, plaintiff must then prove that defendant's articulated reasons are pretextual. *Woodman,* 411 F.3d at 76. "In short, the ultimate burden rests with the plaintiff to offer evidence 'sufficient to support a reasonable inference that prohibited discrimination occurred.'" *Id.* (citing *James v. N.Y. Racing Ass'n,* 233 F.3d 149, 156 (2d Cir. 2000)).

To meet this burden, the plaintiff may rely on evidence presented to establish her *prima facie* case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. *See Desert Palace, Inc. v. Costa,* 539 U.S. 90, 99–101 (2003). However, meeting "*McDonnell Douglas's* minimal requirements of a prima facie case plus evidence from which a factfinder could find that the employer's explanation was false" does not automatically and necessarily require the denial of summary judgment and the submission of the case to the jury. *James,* 233 F.3d at 157. Instead,

the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination. *See id.* at 156; *Connell v. Consol. Edison Co. of N.Y., Inc.*, 109 F. Supp. 2d 202, 207–08 (S.D.N.Y. 2000).

As the Second Circuit observed in *James*, "the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove—particularly discrimination." 233 F.3d at 157; *see also Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998) ("The thick accretion of cases interpreting this burden-shifting framework should not obscure the simple principle that lies at the core of anti-discrimination cases. In these, as in most other cases, the plaintiff has the ultimate burden of persuasion.").

## 2. Application

### a. *Prima Facie* Case

Defendants argue that they should be granted summary judgment on plaintiff's Title VII and ADEA claims because plaintiff cannot establish a *prima facie* case of discrimination. Because plaintiff must establish the same *prima facie* case with regard to both her race and age discrimination claims, the Court will address these claims together for purposes of the *prima facie* analysis. As an initial matter, defendants do not dispute, for purposes of this motion, that plaintiff could establish that she is a member of a protected group. (Defs.' Mem. of Law at 9.) Likewise, defendants accept for purposes of this motion that plaintiff suffered an adverse employment action. (*Id.*) Specifically,

plaintiff alleges that she suffered two adverse employment actions—namely, the elimination of her position and the District's subsequent failure to re-hire her to any comparable position—which when "viewed together or independently . . . raise an inference of discrimination." (Pl.'s Opp. at 9.) However, defendants do contend that plaintiff cannot demonstrate she was qualified for the assistant principal position that she sought after her previous position was abolished. In addition, defendants argue that plaintiff cannot show that the abolishment of her position and subsequent failure to hire her in a comparable position give rise to an inference of discrimination. The Court disagrees, and addresses each issue in turn.

### i. Qualifications for the Position

For purposes of this motion, defendants do not dispute that plaintiff could establish that she was qualified for her position as Administrative Assistant for Early Childhood. (Defs.' Mem. of Law at 9.) However, defendants do argue that plaintiff cannot establish that she was qualified for the assistant principal positions that she sought after her previous position was abolished. (*Id.* at 14.) For the reasons set forth *infra*, the Court disagrees with defendants and concludes that there is a disputed issue of fact on this point that precludes summary judgment.

Defendants argue that the reason plaintiff did not continue in the interview process for this position was that the interview committee felt her experience was "too limited to early childhood issues and that she did not seem well-rounded enough for the position." (Defs.' 56.1 ¶ 83.)[11] Defendants also note that the candidate who

---

[11] Plaintiff has disputed this statement. (Pl.'s 56.1 ¶ 83.)

ultimately was hired for the position, Amy Dirolf, had experience as a teacher, administrative intern at the elementary level, principal of an elementary level summer program, and principal of a sixth grade enrichment program. (*Id.* ¶ 86.) Although plaintiff acknowledges that Dirolf had experience in these cited positions, plaintiff notes that Dirolf had no experience as an assistant principal. (Pl.'s Opp. at 14; Kantrowitz Depo. at 126:21-23.) Moreover, plaintiff testified at her deposition that she had served as an assistant principal for sixth months and that the administrative experience she had was "akin to being an assistant principal." (Kantrowitz Depo. at 126:24-127:8.) Indeed, it is undisputed that, as part of her job as Administrative Assistant for Early Childhood, plaintiff was tasked with, *inter alia*, supervising the kindergarten, first grade, and second grade staffs; providing enrichment activities and recommending the supplies for Early Childhood grades; meeting with the five elementary school principals to discuss teacher observations, mid-year and end-of-year evaluations, and curriculum monitoring issues; attending elementary faculty meetings; and visiting the five elementary schools on a regular basis to model strategies of instruction, present new materials, and informally assess the delivery of instruction. (Defs.' 56.1 ¶ 34; Pl.'s 56.1 ¶ 34 (both citing Defs.' Ex. N).) Accordingly, based upon this record and drawing all reasonable inferences in plaintiff's favor, the Court finds that plaintiff has put forth sufficient evidence to create a disputed issue of fact regarding her qualification for the assistant principal position in question. Thus, defendants' motion for summary judgment on this ground is denied. *See Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 171 (2d Cir. 2006) ("'*McDonnell Douglas* requires only a minimal showing of qualification to establish a *prima facie*

claim. [A plaintiff] only needs to demonstrate that she possesses the basic skills necessary for performance of [the] job.'" (quoting *Owens v. New York City Housing Auth.*, 934 F.2d 405, 409 (2d Cir. 1991))); *Johnson v. Connecticut*, --- F. Supp. 2d ----, 2011 WL 2947036, at *6 (D. Conn. Jul. 20, 2011) (plaintiff had met burden on *prima facie* case to demonstrate qualification for job on failure to promote claim where "[p]laintiff was pre-screened and received an interview because he had the requisite qualifications").

### ii. Circumstances Giving Rise to an Inference of Discrimination

The Court concludes that plaintiff has put forth sufficient evidence to create a genuine issue of disputed fact regarding whether the circumstances surrounding her termination—including the abolishment of her position and the District's subsequent failure to hire her into a comparable position—give rise to an inference of race and age discrimination. As discussed in detail below with respect to the ultimate issue of whether defendant's articulated non-discriminatory reasons for their employment decisions were pretextual, plaintiff has proffered sufficient evidence regarding the circumstances surrounding these employment actions to meet this *prima facie* requirement.

### b. Evidence of Pretext

Even though plaintiff has established a *prima facie* case, defendants have articulated a legitimate, non-discriminatory reason for their employment actions—namely, (1) that plaintiff's position was abolished for purposes of economy and efficiency, and (2) that she was not qualified for the assistant principal position. Hence, the Court proceeds directly to the ultimate question of whether plaintiff has presented sufficient

evidence from which a reasonable jury, if all of plaintiff's evidence is credited and all reasonable inferences are drawn in her favor, could find age and/or race discrimination.[12]

### i. Race Discrimination Claims

In response to defendant's motion for summary judgment, plaintiff points to several pieces of evidence in support of her position that a reasonable jury could find that defendant's proffered non-discriminatory reasons were a pretext for race discrimination.

First, as to plaintiff's race discrimination claim, plaintiff presented evidence that, in January 2007, approximately seven months before plaintiff's termination, several African American administrators were going to boycott a party plaintiff was organizing because Dr. Mangum, also African American, had not been invited. Although Dr. Mangum denied having any involvement in the planning of the boycott, construing the evidence in plaintiff's favor for purposes of the current motion, plaintiff has put forth sufficient evidence on this point to create a disputed issue of fact that survives summary judgment. In particular, plaintiff testified that she received a call about the boycott after she informed Dr. Mangum that she could not attend the party and that, during this call, it was not made clear whether the administrators themselves or Dr. Mangum had spearheaded the boycott. (*See generally* Kantrowitz Depo. at 64:14-71:20; Mangum

Depo. at 29:5-18.) Thus, plaintiff asserts that Dr. Mangum harbored race-based animosity toward plaintiff stemming from this January 2007 planned boycott of the union party (organized by plaintiff) by African American administrators.

Second, plaintiff points to evidence that, in May 2007, prior to Dr. Mangum's appointment to the Board, the Board apparently approved plaintiff's position in the budget. (Kantrowitz Depo. at 57:4-5.) In addition, two months later, in July 2007, plaintiff attended the Oxford Roundtable to present a paper, after having been recommended to attend by Dr. Lloyd and approved to attend by the Board. (Defs.' 56.1 ¶¶ 50-51; Kantrowitz Depo. at 57:4-5.) In addition, around the time that plaintiff attended the conference in July 2007, Dr. Mangum was appointed to the Board and attended a retreat with other Board members and certain administrators, including Dr. Lloyd. (Defs.' 56.1 ¶¶ 14, 52; Lloyd Depo. at 22:25-23:8.) Approximately two weeks after the retreat, and after plaintiff returned from Oxford, she was informed that her position was going to be abolished. (Defs.' 56.1 ¶ 63.)

Third, plaintiff has put forth evidence that, prior to Dr. Mangum's appointment to the Board, her work was viewed, at the very least, as satisfactory. For example, only a year prior to her termination, plaintiff has received a favorable review from Dr. Lloyd, in which it was noted that not only would plaintiff attend the Oxford Roundtable and "bring global recognition to the District" but also that the Dr. Lloyd and Ms. Llewellyn looked "forward to [plaintiff's] continued help and assistance with our District Goals and thank her for being a conscientious and outstanding administrator." (Defs.' Ex. EE.) Moreover, the Board had approved her position in the budget in May 2007 and had approved her travel to the July 2007

---

[12] Although plaintiff and defendants address each adverse action separately, the Court addresses the two adverse actions—namely, the abolishment of plaintiff's position and the failure to re-hire her to a comparable position in the District—in the same section because of the overlapping evidence that plaintiff uses to support both of these claims.

roundtable, at which Dr. Lloyd thought plaintiff would do "a nice job representing the district." (Lloyd Depo. at 16:13-16.) Nevertheless, only two weeks after going to the roundtable, and in the same month that Dr. Mangum had been appointed to the Board and attended a retreat with District administrators, plaintiff was informed that her position would be abolished. Although defendants deny that plaintiff's position was discussed at the retreat, plaintiff testified that she remembered Dr. Lloyd saying the abolishment of her position was recommended on the retreat. (*Compare* Lloyd Depo. at 70:24-71:4 *with* Kantrowitz Depo. at 87:5-8.)

Fourth, plaintiff has presented evidence regarding the incomplete nature of the evaluation of her position in support of her contention that it was pretextual. Specifically, plaintiff asserts that her "evaluation" was mere window dressing intended to legitimize a decision that had already been recommended at the retreat to terminate her position. For example, plaintiff points to evidence that Dr. Lloyd spoke selectively to only four of the five current principals with whom plaintiff worked, after expressly declining to speak to the fifth (Caucacian) principal because this principal supposedly would only have positive things to say about plaintiff. In addition, he took no notes of his single phone conversations with each principal, nor did he keep any other written records related to the evaluation. Dr. Lloyd also declined to speak to the Deputy Superintendent and plaintiff's boss, Maryann Llewellyn, because he had heard from an unspecified source that plaintiff and Llewellyn were friends. Llewellyn's testimony reveals, however, that while she may have been friendly with plaintiff, the two of them had socialized on only "maybe three" occasions. (Llewellyn Depo. at 12:22-14:2.)

Fifth, with respect to the failure to hire her to the assistant principal position, plaintiff points to the following evidence: (1) plaintiff's evidence regarding her qualifications as compared to Dirolf's qualifications; (2) that plaintiff was not offered comparable positions when her original position was abolished; (3) that Dr. Lloyd refused to create a permanent position for plaintiff when such a position was proposed by Ms. Llewellyn and Ms. Friedman; and (4) that the interview committee for the only assistant principal position for which plaintiff was invited to interview had as a member a teacher who potentially harbored animus against plaintiff because plaintiff had opposed that teacher's tenure.

Finally, plaintiff has put forth evidence that purportedly demonstrates that similarly situated minority employees were treated more favorably than plaintiff. In particular, as noted *supra*, plaintiff has pointed to two minority employees who were granted extensions on their probationary periods when it became clear that they would not immediately be receiving tenure, and another candidate who was allowed to return to a previously held middle school teaching position when she was notified that she would not be recommended for tenure in her assistant principal position. (*See* Defs.' 56.1 ¶¶ 109-11, 113-17.) According to plaintiff, when plaintiff was informed that her position would be abolished, in contrast, not only was she not offered comparable positions, but her request to use her sick days while she looked for another job was denied by the Board (Kantrowitz Depo. at 93:10-94:7), and Ms. Llewellyn and Ms. Friedman's proposal to create a permanent teaching position was plaintiff was rejected by Dr. Lloyd. (Defs.' 56.1 ¶ 79.)

Although defendants contend that these employees were not similarly situated to

plaintiff (Defs.' Mem. of Law at 13), the Court disagrees and finds that there is a genuine issue of disputed fact on this point that precludes summary judgment. It is well-settled that a plaintiff can raise an inference of discrimination by showing disparate treatment—namely, that a similarly situated employee outside the protected group received more favorable treatment. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977); *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003); *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999). The law does not require the employees to be similarly situated in all respects, but rather requires that they be similarly situated in all material respects. *See McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001) ("A plaintiff is not obligated to show disparate treatment of an *identically* situated employee." (emphasis in original)); *accord Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997). The Second Circuit has further defined what the term "all material respects" means in this context:

> What constitutes "all material respects". . . varies somewhat from case to case and, as we recognized in *Norville*, must be judged based on (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness . . . . Hence, the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical . . . . The determination that two acts are of comparable seriousness requires—in addition to an examination of the acts—an examination of the context and surrounding circumstances in which those acts are evaluated.

*Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) (internal citations omitted). In the instant case, plaintiff is comparing herself to minority employees subject to the same workplace standard—they were all teachers or administrators in the same District during the time since Dr. Lloyd was appointed as Superintendent. As to whether the abolishment of a position is comparable to a grant of an extension on a probationary term, defendants have presented no evidence other than conclusory statements in their brief to support their argument that these two employment actions are not sufficiently similar. Under these circumstances, the Court cannot conclude that no reasonable jury could find the similarly situated requirement was met. *See Graham*, 230 F.3d at 39 ("Whether two employees are similarly situated ordinarily presents a question of fact for the jury."); *see also Lizardo v. Denny's, Inc.*, 270 F.3d 94, 101 (2d Cir. 2001) (same); *cf. Curry v. City of Syracuse*, 316 F.3d 324, 333 (2d Cir. 2003) ("It is well established that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'" (quoting *Fischl v. Armitage*, 128 F.3d 50, 55-56 (2d Cir. 1997))).

In short, viewing the evidence in the light most favorable to plaintiff and drawing all reasonable inferences in her favor, the Court concludes that sufficient evidence exists to raise an issue of material fact as to whether defendants' reasons for the abolishment of plaintiff's position, and subsequent refusal to re-hire her to a

comparable position, were a pretext for race discrimination. Accordingly, the evidence is sufficient for plaintiff to survive defendants' summary judgment motion on her race discrimination claims.

### ii. Age Discrimination Claims

The Court reaches the same conclusion regarding plaintiff's age discrimination claim. In connection with this claim, plaintiff relies on some of the same evidence of pretext—including her satisfactory performance and purportedly incomplete nature of defendants' evaluation of her position—that was utilized above with respect to the race discrimination claim. In addition, there is evidence in the record that at least one younger employee who plaintiff alleges is similarly situated to her was treated more favorably than plaintiff. (*See* Defs.' 56.1 ¶¶ 113-14 (noting that thirty-four year old teacher requested and was granted extension on probationary period and later was granted tenure).) Moreover, the District filled the assistant principal position from which plaintiff was rejected with a thirty-one year old candidate whose qualifications, as compared to plaintiff's, have been placed in dispute, as discussed *supra. See Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 317 (2d Cir. 1999) (noting that "the fact that the replacement is substantially younger than the plaintiff is a more valuable indicator of age discrimination, than whether or not the replacement was over 40"). Based on the record as a whole, and drawing all reasonable inferences in plaintiff's favor, the Court concludes that plaintiff has put forth sufficient evidence to create a disputed issue of fact as whether the defendants' employment decisions as to plaintiff were a pretext for age discrimination. Therefore, her age discrimination claims also survive defendants' motion for summary judgment.

\* \* \*

In sum, although defendants have pointed to portions of the record that defendant argues undermine the strength of various aspects of plaintiff's proffered evidence of discrimination, plaintiff's evidence is sufficient, when construed most favorably to plaintiff, to survive defendants' summary judgment and to require these discrimination claims, including critical issues of credibility, decided by a jury. [13]

---

[13] The Court notes that discrimination claims brought pursuant to the NYSHRL are governed by the same standards as govern ADA, ADEA, and Title VII claims. *See Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006) (Title VII); *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 332 n.1 (2d Cir. 2000) (ADA); *Devlin v. Transp. Commc'ns Int'l Union*, 173 F.3d 94, 100 (2d Cir. 1999) (ADEA). Moreover, employment discrimination claims brought pursuant to Sections 1981 and 1983 are analyzed under the three-step, burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. See Mavrommatis v. Carey Limousine Westchester, Inc.*, No. 10-3404-cv, 2011 WL 3903429, at \*2 (2d Cir. Sept. 7, 2011) (noting that discrimination claims brought pursuant to § 1981 are analyzed under *McDonnell Douglas*); *Kearney*, 185 F. App'x at 70 (holding that plaintiff's "equal protection claim pursuant to 42 U.S.C. § 1983 for age-based employment discrimination fails for the same reasons that her ADEA and NYSHRL claims fail" under *McDonnell Douglas* analysis); *Sorlucco*, 888 F.2d at 6-7 (2d Cir. 1989) (holding that three-step analysis outlined in *McDonnell Douglas* applies to claims brought under § 1983). Therefore, for the same reasons that the Title VII and ADEA claims survive summary judgment, the Section 1981, Section 1983, and NYSHRL claims based on such alleged conduct also survive summary judgment.

## B. Disability Discrimination Claims

In contrast to her Title VII and ADEA claims, the Court concludes that plaintiff has not put forth sufficient evidence to survive summary judgment on her disability claims. As an initial matter, it is undisputed that: (1) in October 2002, plaintiff was diagnosed with lung cancer; (2) in December 2002, plaintiff suffered a stroke; and (3) from December 2002 until July 2003, plaintiff took a medical leave of absence for lung removal surgery. (Defs.' 56.1 ¶¶ 27-28, 31; Pl.'s 56.1 ¶ 33.)

However, it is equally uncontroverted that plaintiff suffers no ill-effects from these medical issues that would impair or affect her ability to do her job. (Defs.' 56.1 ¶¶ 29, 32-33 (noting that, besides running, there is nothing plaintiff is unable to do as a result of her stroke or lung cancer).) Moreover, despite her on-going medical problems in 2002 and 2003, plaintiff acknowledges that, in December 2002, she was granted tenure *early* and, in fact, she received notice of her tenure while she was in the hospital for her lung removal surgery. (Defs.' 56.1 ¶ 30; Defs.' Supp. 56.1 ¶ 30.1; Kantrowitz Depo. at 29:11-16.) Approximately four years after plaintiff returned from her medical leave, she was informed that her position would be abolished. Plaintiff's only disability-related allegations during this four-year time period pertain to comments she claims one principal and one assistant principal repeatedly made to her to the effect of "oh, you will have to go to the second floor" or "I am sorry, you are going to have to walk up stairs." (Kantrowitz Depo. at 107:22-108:7.) Although one of these administrators (Jennifer Bumford) was consulted by Dr. Lloyd when he was conducting his evaluation of plaintiff, it is undisputed that neither of these employees were the ultimate decision-makers with respect to the decision to abolish plaintiff's position. Indeed, when considered in the context of all the evidence, these alleged remarks are too "remote and oblique. . . . in relation to the employer's adverse action" to permit a reasonable jury to find for plaintiff. *Tomassi v. Insignia Fin. Grp.*, 478 F.3d 111, 115 (2d Cir. 2007), *abrogated in part on other grounds by Gross v. FBL Fin. Servs, Inc.*, 129 S.Ct. 2343 (2009). Thus, having carefully reviewed the record as a whole, and having drawn all reasonable inferences in plaintiff's favor, the Court concludes that these isolated comments purportedly made by one principal and one assistant principal, in which they allegedly apologized to plaintiff for making her walk up stairs, are insufficient to raise an inference of disability discrimination. *See, e.g.*, *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992) ("Stray remarks by non-decision-makers or by decision-makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision."); *Georgy v. O'Neill*, No. 00 Civ. 0660, 2002 WL 449723, at *6 (E.D.N.Y. Mar. 25, 2002) (holding that alleged reference to national origin by non-decisionmaker six months prior to plaintiff's termination was "the kind of isolated stray remark insufficient, without more, to raise an inference of discrimination and defeat summary judgment"); *Corcoran v. Gab Bus. Servs., Inc.*, 723 F. Supp. 966, 968-69 (S.D.N.Y. 1989) (holding plaintiff failed to meet *de minimis* burden where he introduced only two isolated comments made by individuals who had no involvement in his termination). Moreover, given the undisputed facts—including the long period of time between the alleged disability and the purported adverse actions and the fact that she received tenure in 2002 while in the hospital—no rational jury could find disability discrimination in this case. Accordingly, summary judgment in

defendants' favor on the disability claims is warranted.

## C. *Monell* Liability

Plaintiff also has brought claims pursuant to § 1981 and § 1983 against the District and the Board, alleging that they violated her equal protection rights. Defendants have moved for summary judgment on these claims on the ground that plaintiff cannot demonstrate that she suffered a constitutional violation as a result of a District policy, custom, or practice. For the reasons set forth below, the Court disagrees.

Pursuant to the Supreme Court's decision in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipal entity may only be held liable where the entity itself commits a wrong; "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691. It is well established that "[a] plaintiff stating a . . . claim via § 1983 for violation of the Equal Protection Clause by a school district or other municipal entity must show that the [violation] was the result of municipal custom, policy, or practice." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257-58 (2009) (citing *Monell*, 436 U.S. at 694); *see also Monell*, 426 U.S. at 692-96 (finding the same for a school board); *Beattie v. Madison Cnty. Sch. Dist.*, 254 F.3d 595, 600 n.2 (5th Cir. 2001) ("Under § 1983, [plaintiff] may sue a local governing body, such as the school district, or the school board as policymaker for the district, for monetary, declaratory, or injunctive relief if the challenged action implements or executes a policy officially adopted by that body's officers. Neither the school board nor the school district can be liable for the actions . . . under a respondeat superior theory."). "The policy or custom need not be memorialized in a specific rule

or regulation." *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) (citing *Sorlucco*, 971 F.2d at 870). A policy, custom, or practice of the municipal entity may be inferred where "'the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.'" *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) (quoting *Kern*, 93 F.3d at 44). "A municipality's failure to train or supervise its officers can rise to the level of an actionable policy or custom where it amounts to 'deliberate indifference' to the constitutional rights of its citizens." *Hall v. Marshall*, 479 F. Supp. 2d 304, 315-16 (E.D.N.Y. 2007) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989) and *Thomas v. Roach*, 165 F.3d 137, 145 (2d Cir. 1999) ("A municipality may be liable under § 1983 . . . where the City's failure to supervise or discipline its officers amounts to a policy of deliberate indifference.")). "For purposes of § 1983, school districts are considered to be local governments and are subject to similar liability as local governments under *Monell*." *Booker v. Bd. of Educ.*, 238 F. Supp. 2d 469, 475 (N.D.N.Y. 2002) (citing *Monell*, 436 U.S. at 696-97); *cf. Irene B. v. Phila. Acad. Charter Sch.*, No. 02-1716, 2003 U.S. Dist. LEXIS 3020, at *38 (E.D. Pa. Jan. 29, 2003) (treating charter school as municipal entity for *Monell* purposes).

Here, plaintiff has alleged that the School Board discriminated against her on the basis of her race, in violation of the Equal Protection Clause. As discussed *supra*, plaintiff has put forth sufficient evidence to create a disputed issue of fact regarding whether the Board, through the influence of Dr. Magnum, was involved in the decision to abolish plaintiff's position based upon allegedly discriminatory motives. Accordingly, plaintiff has provided sufficient evidence regarding her §

1983 equal protection claim against the School District, to survive summary judgment.

## D. Individual Claims against Dr. Lloyd and Dr. Mangum[14]

Defendants have moved for summary judgment on the Section 1981 and Section 1983 claims asserted against Dr. Lloyd and Dr. Mangum on the ground that plaintiff cannot establish the personal involvement of either defendant in the alleged constitutional violations. The Court disagrees.

To state a claim for individual liability under § 1983, "a plaintiff must demonstrate a defendant's *personal* involvement in the alleged [constitutional violation] in order to establish a claim against such defendant in his individual capacity." *Valenti v. Massapequa Union Free Sch. Dist.*, No. 09-CV-977 (JFB)(MLO), 2010 WL 475203, at *8 (E.D.N.Y. Feb. 5, 2010) (citation omitted) (emphasis in original); *see Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1948 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987) ("Absent some personal involvement by [a defendant] in the allegedly unlawful conduct of his subordinates, he cannot be held liable under section 1983." (citations omitted)). "[M]ere bald assertions and conclusions of

law do not suffice." *Davis v. Cnty. of Nassau*, 355 F. Supp. 2d 668, 677 (E.D.N.Y. 2005) (citation and internal quotation marks omitted). The same standard applies for individual liability under Section 1981. *See Patterson*, 375 F.3d at 229.

Here, as discussed in great detail *supra*, plaintiff has put forth evidence outlining the personal involvement of both Dr. Lloyd and Dr. Mangum in the decision to abolish plaintiff's position, beginning with the Board and administrator's retreat and culminating with Dr. Lloyd's evaluation of plaintiff. Accordingly, the Court concludes that plaintiff has presented sufficient evidence to overcome a motion for summary judgment on her claims against the individual defendants.

## IV. Conclusion

For the reasons set forth herein, the Court denies defendants' motion for summary judgment with respect to plaintiff's race and age discrimination claims, but grants defendants' motion with respect to plaintiff's disability discrimination claim. The Court also denies defendants' motion for summary judgment on the *Monell* claim and on the claims against the individual defendants.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Date:   September 30, 2011
        Central Islip, NY

* * *

Plaintiff is represented by Steven A. Morelli, Elaine R. Sammon, and Lorraine M. Ferrigno of The Law Offices of Steven A.

---

[14] Based upon plaintiff's opposition and complaint, it is clear that plaintiff is only seeking individual liability for the alleged violations of her equal protection rights pursuant Section 1981 and 1983, and the individual defendants' alleged violations of the NYSHRL. The Court notes that individual liability may be available under the NYSHRL. *See Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003).

Morelli, P.C., 1461 Franklin Ave., Garden City, NY 11530. Defendants are represented by Lewis R. Silverman, Rutherford & Christie, LLP, 369 Lexington Avenue, New York, NY 10017.